**NOT FOR PUBLICATION**

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW JERSEY

|  |  |
|---|---|
| TIMOTHY H. ALEXANDER, | Civil Action No. 21-15002 (SDW) (CF) |
| Plaintiff, | |
| v. | **OPINION** |
| TOWNSHIP OF GUTTENBERG, *et al.*, | January 14, 2026 |
| Defendants. | |

**WIGENTON**, District Judge.

Before this Court are *pro se* Plaintiff Timothy Alexander's[1] ("Plaintiff" or "Alexander")

Appeal of Magistrate Judge Cathy L. Waldor's April 3, 2025 Order denying his request to re-open

fact discovery (D.E. 176)[2]; and Defendants the Township of Guttenberg, Guttenberg Police

Department Director Joel Magenheimer (ret.), and Police Lieutenant Juan Barrera (ret.)'s

("Administrative Defendants") Motion for Summary Judgment (D.E. 180); and Defendants Police

---

[1] At the inception of this case, Plaintiff was represented by counsel. On November 14, 2024, Michael Stewart, Esq., of the law firm of Peri Stewart Malia filed a Notice of Motion to Withdraw as counsel. (D.E. 135.) Four days later, Timothy Smith of Caruso Smith Picini PC also filed a Notice seeking to Withdraw as counsel. (D.E. 137.) Both attorneys were instructed to file a formal motion on or by December 4, 2024, (D.E. 136, 138), and did so, (D.E. 140, 142). After hearing oral argument on the withdrawal motions, Magistrate Judge Cathy L. Waldor ("Judge Waldor") granted both motions. (D.E. 154, 159, 160.) Thereafter, Plaintiff—who is an attorney—has proceeded *pro se*. (See D.E. 71 at 1–2 (denoting Plaintiff is an attorney); *see also* D.E. 53 (text order permitting Plaintiff to appear *pro se* and to view discovery materials marked as "Attorneys Eyes Only").

[2] Citations to "D.E." refer to docket entries in the Court's Electronic Case Filing System for this matter and any internal citations contained therein, unless otherwise indicated.

Sergeants Jeffrey Lugo, Aleksander Ramadanovic, and Marcin Rysiec, Lieutenant Raphael Martinez, and Officer Byron Dominguez's ("Officer Defendants") Motion for Summary Judgment (D.E. 179) pursuant to Federal Rule of Civil Procedure ("Rule") 56.[3] Jurisdiction is proper pursuant to 28 U.S.C. § 1331 and § 1367(a). Venue is proper pursuant to 28 U.S.C. § 1391. This opinion is issued without oral argument pursuant to Rule 78 and Local Civil Rule 78.1. For the reasons stated herein, the Motions for Summary Judgment are **GRANTED**.

I.    **FACTUAL BACKGROUND**[4]

   A. **Incident at Galaxy Tower Two**

On August 16, 2019, Plaintiff Timothy Alexander, a resident of Galaxy Towers[5] in Guttenberg, New Jersey, was in front of Tower Two sometime before 6:15 a.m. and encountered an Uber driver. (Pl. SOMF ¶ 4.) The Uber driver was handwashing his black SUV Escalade by the front entrance when Plaintiff approached, said something to the effect of, "What, is the president here?" and proceeded to question the driver as to who the car belonged to and why the driver was washing the car. (D.E. 185-2, Pl. Exhibit ("Ex.") B at 3:10–25; D.E. 180-6, Guttenberg

---

[3] Consistent with Rule 56(c), this Court considers the parties' Statement of Material Facts ("SOMF") and any responses thereto, as well as the depositions and documents in the record. Where a SOMF cites to the record, this Court cites to the same. Additionally, where a party failed to counter a material fact in accordance with Local Rule 56.1's requirements, this Court deems that fact as undisputed for purposes of the Motions.

[4] There are video recordings of either all, or portions of, the incidents detailed herein. Although Federal Rule of Civil Procedure 56 requires that this Court "construe the record in the light most favorable to the nonmoving party," this Court will not draw inferences in Plaintiff's favor that are inconsistent with the video footage of the incidents. *Ference v. Township of Hamilton*, 538 F. Supp. 2d 785, 789, 797 (D.N.J. 2008); *see Scott v. Harris*, 550 U.S. 372, 380 (2007) (indicating that "[w]hen opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment" and stating the Court of Appeals should not have relied on the respondent's version of facts, but should "have viewed the facts in the light depicted by the videotape").

[5] The Galaxy Towers complex is comprised of three towers. (D.E. 187-2 ("Pl. SOMF") at 2 ¶ 4.)

Exhibit ("Ex.") E at 00:00–10.)[6]  Alexander then sneered, "Oh, now you're going to tell me to mind my own business?"  (Guttenberg Ex. E at 00:12–15.)  The driver responded, "I'm going to tell you to mind your own f[***]ing business."  (*Id.* at 00:15–17.)  Alexander proceeded to ask the driver to "repeat himself."  Initially the driver responded, "Tell you sh[*]t," but after Alexander continued to badger him, he pleaded, "Please get out of my way," seven times.  (*Id.* at 00:18–38.)

The video recording then pans to Tower Two's front entrance, where a security officer is standing, and Plaintiff states, "This will be so much fun, get security up here."  (*Id.* at 00:38–42.)  The driver also states:  "Get security out here."  (*Id.* at 00:43–44.)  The video then pans back to the driver, who states "Mind your own business, okay?" as he continues cleaning the vehicle.  (*Id.* at 00:44–48.)  Plaintiff—who appears to mock the driver's accent—then said "mind your business" twice and panned the video camera to the floor.  (*Id.* at 00:49–1:05.)  The last thing Plaintiff is clearly heard saying is, "I'm just wondering whose car this is."  (*Id.* at 1:03–05.)

Janette Moyett, the security officer that came out to the plaza at some point during the altercation, stated that Plaintiff was yelling at her.  (D.E. 180-5, Guttenberg Ex. C at 38:3–8.)  Moyett noticed Plaintiff was intoxicated by his smell and his behavior of "walking through the plaza screaming and cursing at everybody" at 6:30 in the morning.  (*Id.* at 39:1–5.)  Moyett attempted to calm Plaintiff down to no avail, so pursuant to protocol, she called her supervisor and requested that the police be called.  (*Id.* at 38:16–17, 40:1–9.)  Moyett stated she felt it was necessary to call the police because "[Plaintiff] was walking around and he was following [the driver], so [she] felt that [Plaintiff] was threatening him."  (*Id.* at 40:15–19.)

### B.  Incident at Galaxy Tower One

---

[6] Guttenberg Exhibit E is a phone recording of the incident taken by Plaintiff.

The Guttenberg Police Department ("GPD") records demonstrate that the police received a call at 6:25 a.m. from the Galaxy Towers's concierge and dispatched Officers Dominguez and Ramadanovic at 6:27 a.m. and Sergeant Jeffrey Lugo at 6:28 a.m., respectively. (D.E. 180-5, Guttenberg Ex. A at 3; D.E. 180-2 ("Guttenberg SOMF") ¶ 11.) By this point, Plaintiff had walked from Tower Two to Tower One. (Guttenberg SOMF ¶ 10.) When the officers arrived,[7] Plaintiff presumed they were there to see him and rather than entering Tower One, he stopped to speak with them. (Pl. Ex. B at 7:8–24.) As recorded by Plaintiff on his cellphone, the following exchange ensued:

OFFICER 1: What's going on, brother?

ALEXANDER: Nothing.

OFFICER 1: Well, there must be something 'cause they called us here.

ALEXANDER: Yeah, because somebody has a bad opinion.

OFFICER 1: About what?

ALEXANDER: I actually do 1983 jobs for a living. That's sort of what I do, so if you're going to come at me that way, I'm not . . . (indiscernible) . . .

OFFICER 2: (indiscernible)

ALEXANDER: All right, well I'm going home.

OFFICER 1: Sir, you're not going home yet. Sir, I'm talking to you.

ALEXANDER: Are you detaining me?

OFFICER 1: Yes, I am.

OFFICER 2: Back up. Back up.

OFFICER 1: Just tell me what happened, that's all I need.

---

[7] Sergeant Lugo and Officer Dominguez arrived on the scene first, followed by Officer Ramadanovic. (D.E. 179-1, Officer Defs. Ex. E at 100:22–25.)

(D.E. 180-6, Guttenberg Ex. F at 2:41–3:19.)  The video then cuts off.  Both sides agree that the officers asked Plaintiff for his identification and that Plaintiff did not want to provide it but ultimately did so.  (Pl. SOMF ¶ 9; D.E. 179-1, Officer Defs. Ex. G ("Lugo Dep.") at 151.)

At this juncture the parties diverge as to what transpired thereafter.  According to Defendants, "[P]laintiff pushed the police officers, whereupon [P]laintiff was taken to the ground, handcuffed and arrested."  (Guttenberg SOMF ¶ 21; Lugo Dep. at 153 ("You pushed into myself and my officers and you were controllably taken down to the ground."); D.E. 179-1, Officer Defs. Ex. F ("Dominguez Dep.") at 138:9–11 ("Sir, you walked into us.  We were telling you to please stay put, and you continued to walk towards us."); D.E. 179-1, Officer Defs. Ex. E ("Ramadanovic Dep.") at 107:14–108:9 (describing that Plaintiff was arrested because he attempted to push through officers multiple times, both before and after providing identification).)  Plaintiff maintains that after providing his identification, he tried to walk away when the officers assaulted him, but he "did not see who assaulted him or how."  (Pl. SOMF ¶¶ 12–13, 16–17.)  A photograph attached to Galaxy Tower employee Erika Mantilla's report[8] of the incident depicts the three officers on top of Plaintiff, who is lying on the floor face first.  (D.E. 185-3, Pl. Ex. D at 3.)

Thereafter, at approximately 6:36 a.m., Plaintiff was transported to the Guttenberg Police Department Headquarters ("Headquarters").  (Guttenberg Ex. A at 2.)  The North Bergen Emergency Medical Services ("EMS") arrived at Headquarters, assessed Plaintiff, and found a "laceration with bleeding around [the] left knee."  (D.E. 180-6, Guttenberg Ex. H at 14.)  The

---

[8] In her report, Mantilla—who was in Tower One's vestibule—described how Alexander "was not looking like he was cooperating.  After some back and fourth [sic], it seemed as though he was trying to walk through them – but in the process put one of his hands up as to perhaps shove them out of the way.  That is when the cops basically took him down."  (D.E. 185-3 at 4.)  At her deposition Mantilla confirmed that from where she was standing in the vestibule "it was clear as day" that Plaintiff was being or "looked" aggressive and attempted to push through the cops.  (D.E. 180-5, Guttenberg Ex. D at 59:6–10, 60:3–13.)  When asked by defense counsel whether she saw Plaintiff touch a police officer, Mantilla responded:  "It looked like that to me, yes, it looked like that to me."  (*Id.* at 86:3–6.)

Emergency Medical Technicians ("EMTs") treated Plaintiff's injury. (Pl. SOMF ¶ 32; Guttenberg SOMF ¶¶ 24–25.) Photographs submitted by Plaintiff also show a small pink mark on the front right side of Plaintiff's head, which Plaintiff submits is a contusion. (D.E. 185-8, Pl. Ex. H at 2; Pl. SOMF ¶ 32.)

After being taken to the Palisades Medical Center and then back to Headquarters, Plaintiff was released from police custody at about 10:15 a.m. (Guttenberg Ex. A at 2.) Back cell room footage shows that while Officers Ramadanovic and Dominguez were chatting and preparing a form, Plaintiff approached their desks, took police files from one of the desks and a plastic bag containing his personal belongings, and proceeded to receive the document Officers Ramadanovic and Dominguez were conferring about from one of them. (D.E. 180-6, Guttenberg Ex. J.) Plaintiff then left the premises. (*Id.*)

### C. Charges Brought Against Plaintiff & Resolution Thereof

Three sets of charges were brought against Plaintiff. The first Complaint Summons issued against Plaintiff charged him with committing a fourth-degree violation of N.J. Stat. Ann. § 2C:12-1(b)(5)(a)[9] for "aggravated assault" on Sergeant Lugo and Officers Dominguez and Ramadanovic, and engaging in a petty disorderly persons offense *contra* N.J. Stat. Ann. 2C:33-2(a)(1)[10] for his conduct towards Galaxy Towers staff and the driver. (D.E. 180-6, Guttenberg Ex. G.) Following discovery of Plaintiff's taking of the police files at the GPD, Officer Dominguez obtained a

---

[9] N.J. Stat. Ann. § 2C:12-1(b)(5)(a) states that "[a] person is guilty of aggravated assault if the person" commits simple assault upon "[a]ny law enforcement officer acting in the performance of the officer's duties while in uniform or exhibiting evidence of authority or because of the officer's status as a law enforcement officer."

[10] Pursuant to N.J. Stat. Ann. § 2C:33-2, "a person is guilty of a petty disorderly persons offense, if with purpose to cause public inconvenience, annoyance or alarm, or recklessly creating a risk thereof, the person engages in fighting or threatening, or in violent or tumultuous behavior."

Complaint – Warrant charging Plaintiff with violations of N.J. Stat. Ann. §§ 2C:20-3 (theft of movable property), 28-6(1) (altering, destroying, concealing, or removing an official record), 27-3(a)(3) (threatening a public servant), and 28-7(a)(3) (destroying, concealing, removing mutilating, or otherwise impairing the verity or availability of a government record, document, or thing). (D.E. 180-7, Guttenberg Ex. L.)[11]  Lastly, on October 19, 2019, GPD Officer Patrick Giannini issued a Complaint-Summons charging Plaintiff with New Jersey state law violations in relation to Plaintiff's social media postings regarding Sergeant Lugo. (D.E. 180-7, Guttenberg Ex. M; Guttenberg SOMF ¶¶ 40–42.)  In these postings, Plaintiff called Sergeant Lugo a "criminal" and "wife-beater," among other things. (Guttenberg SOMF ¶ 43.)  There were nine charges total pending against Plaintiff.

On July 16, 2021, Plaintiff pleaded guilty to an amended charge of violation of Guttenberg's noise ordinance, Municipal Ordinance § 3-1.1, in exchange for dismissal of all remaining charges. (D.E. 180-7, Guttenberg Ex. O at 30–32.)  The Honorable Cynthia Jackson, J.M.C., also granted Plaintiff a civil reservation. (*Id.* at 31.)

## II.    PROCEDURAL HISTORY

On August 9, 2021, Plaintiff filed his initial Complaint.  Following almost two years of discovery,[12] Plaintiff amended his Complaint on June 17, 2023.[13]  Plaintiff's Amended Complaint

---

[11] Pursuant to the August 16, 2019 Complaint – Warrant, Guttenberg Police arrested Plaintiff and took him to the Hudson County Jail on August 19, 2019. (Guttenberg Ex. A at 3; D.E. 71 ¶ 8.)  Plaintiff was released on August 21, 2019. (Guttenberg SOMF ¶ 39.)

[12] This Court notes that even at the two-year mark, the parties had already had multiple discovery disputes. (*See, e.g.*, D.E. 24 (ordering Defendants to produce thirty minutes of the post-release video, personnel files, and certain IA files, among other discovery), 49 (ordering the production of arrest records), 59 (ordering the defense to turn over IA files reviewed *in camera* and setting forth deposition deadlines).)

[13] This case was reassigned to the undersigned on September 19, 2023. (D.E. 86.)

is the operative pleading and asserts the following claims:  municipal liability under 42 U.S.C. § 1983 ("Section 1983") for an unconstitutional policy, practice, or custom pursuant to *Monell v. Department of Social Services of City of New York*, 436 U.S. 658 (1978) (Count I); violations of Plaintiff's Fourth and Fourteenth Amendment rights (Count II); conspiracy pursuant to 42 U.S.C. § 1985 (Count III); failure to train and/or supervise (Count IV); negligent hiring/retention (Count V); intentional and negligent infliction of emotional distress (Count VI); violations of the New Jersey Civil Rights Act ("NJCRA"), N.J. Stat. Ann. §§ 10:6-1 and -2 (Count VII); and punitive damages (Count VIII).  (*See generally* D.E. 71 ("AC").)

## A.  Relevant Discovery Deadlines[14]

On October 6, 2023, Judge Waldor issued a Text Order permitting Plaintiff to re-depose Officer Dominguez and allowing Plaintiff "a total of 12 fact depositions and 1 30(b)(6) deposition."  (D.E. 89.)  On December 14, 2023, the parties were given until February 29, 2024 to complete paper discovery and until April 30, 2024 to finish expert discovery.  (D.E. 96.)  On June 13, 2024, Judge Waldor held oral argument concerning discovery disputes and issued an order denying Plaintiff's request to depose six individuals among other relief sought by Plaintiff.  (D.E. 107.)

Following the October 22, 2024 status conference, Judge Waldor issued the following Text Order:

> For the reasons discussed on the record during the 10/22/24 conference, the parties' pending disputes are resolved as follows:  (1) Plaintiff's Motion to Disqualify Counsel, (ECF No. 114), is DENIED; (2) Plaintiff's Motion to Amend Complaint, (ECF No. 114), is DENIED.  All fact discovery is CLOSED.  Affirmative expert reports shall be delivered by 12/18/24.  All expert depositions shall be completed by 3/7/25.  The parties' deadline for filing motions for summary judgment is 4/25/25.  The parties shall file any oppositions on or before 5/9/25.  No reply

---

[14] Given Plaintiff's appeal of Judge Waldor's April 3, 2025 Letter Order denying Plaintiff's second motion to re-open fact discovery, it is necessary to set forth relevant discovery deadlines following Plaintiff's filing of an Amended Complaint.

submissions will be permitted without leave of the Court.  There will absolutely be NO EXTENSIONS of any of these dates.

(D.E. 130.)  Plaintiff subsequently filed a Motion for Reconsideration of the October 22, 2024 Text Order.  (D.E. 132.)  Upon denying Plaintiff's request for reconsideration, Judge Waldor reaffirmed that fact discovery was closed and that the parties should proceed with expert discovery and any motions for summary judgment.  (D.E. 149.)  Less than a week later Plaintiff filed a Motion for Extension of Time to Close Discovery.  (D.E. 50.)  The Court granted in part and denied in part that motion, reopening fact discovery "ONLY to permit Plaintiff to depose Mr. Barrera," but otherwise denying Plaintiff all other relief sought.  (D.E. 154.)

On February 6, 2025, Plaintiff filed a letter requesting access to the Alexander Investigatory Files ("AIF").  Judge Waldor advised Plaintiff via a February 7, 2025 Text Order that he could file a formal motion, but "note[d] the motion ha[d] been filed and denied many times before."  (D.E. 158.)  On February 18, 2025, Plaintiff not only renewed his request for the AIF, but also raised a "newly discovered significant issue," and requested the ability to depose Internal Affairs ("IA") Sergeant Giannini.  (D.E. 161 at 2, 5.)  On February 19, 2025, a Text Order was issued stating Plaintiff could "expeditiously file a formal motion regarding his request."  (D.E. 162.)  On February 21, 2025, Plaintiff filed his Second Motion for Discovery.  (D.E. 164.)

On April 3, 2025, Judge Waldor held oral argument, denied Plaintiff's motion, and addressed outstanding expert discovery issues raised by Defendants.  (D.E. 173.)  Relevant to Plaintiff's Appeal, Judge Waldor denied Plaintiff's request for the AIF, noting that she had previously denied this request and that Plaintiff had not presented Her Honor with anything convincing her granting the request was necessary.  (D.E. 174 at 13:6–24.)  Judge Waldor also denied Plaintiff's request to depose Sergeant Giannini.[15]  (D.E. 174 at 21:9.)  Plaintiff appealed

---

[15] This was the fourth time Judge Waldor denied this request.  (D.E. 174 at 19:24–25.)

Judge Waldor's decision on April 24, 2025.  (D.E. 179.)  That appeal was timely opposed.  (D.E. 184 & 190.)

### B.  Motions for Summary Judgment

On April 24, 2025, Officer Defendants moved for summary judgment.  (D.E. 179.)  One day later, Administrative Defendants followed suit.  (D.E. 180.)  Plaintiff filed his Opposition Brief on May 9, 2025.  (D.E. 186.)  Judge Waldor denied Administrative Defendants' request to file a reply brief.  (D.E. 192.)

### III.    LEGAL STANDARDS

### A.  Appeal of a Magistrate Judge's Decision

In federal litigation, magistrate judges have the authority to handle non-dispositive matters. 28 U.S.C. § 636(b)(1)(A), Fed. R. Civ. P. 72(a).  Local Civil Rule 72.1(c) governs appeals from magistrate judges' orders and provides that for non-dispositive orders, "[a] District Judge shall consider the appeal . . . and set aside any portion of the Magistrate Judge's order found to be clearly erroneous or contrary to law."  *See also Halsey v. Pfeiffer*, No. 09-1138, 2010 WL 3735702, at *1 (D.N.J. Sept. 17, 2010) (finding a magistrate judge's discovery ruling fell squarely within Rule 72's standard of review).  "A ruling is clearly erroneous where, although there is evidence to support it," upon reviewing "the entire evidence," the district court is "left with the 'definite and firm conviction that a mistake has been committed.'"  *Essex Chem. Corp. v. Hartford Accident & Indem. Co.*, 993 F. Supp. 241, 245 (D.N.J. 1998) (quoting *United States v. U.S. Gypsum Co.*, 333 U.S. 364, 395 (1948)).  A ruling is contrary to law "if the magistrate judge has misinterpreted or misapplied applicable law."  *Kounelis v. Sherrer*, 529 F. Supp. 2d 503, 518 (D.N.J. 2008) (citing *Gunter v. Ridgewood Energy Corp.*, 32 F. Supp. 2d 162, 164 (D.N.J. 1998)).  The appellant bears

the burden of establishing the magistrate judge's decision was clearly erroneous or contrary to law. *Cardona v. Gen. Motors Corp.*, 942 F. Supp. 968, 971 (D.N.J. 1996).

District judges review a magistrate judge's ruling on a non-dispositive matter—such as an order regarding a discovery issue—for abuse of discretion, giving the magistrate judge "great deference." *Kresefky v. Panasonic Commc'ns & Sys. Co.*, 169 F.R.D. 54, 64 (D.N.J. 1996); *Allen v. Banner Life Ins. Co.*, 340 F.R.D. 232, 236–37 (D.N.J. 2022); *see also Howze v. Jones & Laughlin Steel Corp.*, 750 F.2d 1208, 1213 (3d Cir. 1984) ("[Q]uestions concerning the scope of discovery are among those matters which should be almost exclusively committed to the sound discretion of the district court."). An abuse of discretion is "a clear error of judgment," not "simply a different result which can arguably be obtained when applying the law to the facts of the case." *Tracinda Corp. v. DaimlerChrysler AG*, 502 F.3d 212, 240 (3d Cir. 2007) (quoting *SEC v. Infinity Grp. Co.*, 212 F.3d 180, 195 (3d Cir. 2000)).

## B. Summary Judgment

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The "mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48 (1986). A fact is only "material" for purposes of a summary judgment motion if a dispute over that fact "might affect the outcome of the suit under the governing law." *Id.* at 248. A dispute about a material fact is "genuine" if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.* A dispute is not genuine if it merely involves "some metaphysical

doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986).

The moving party bears the initial burden of demonstrating the absence of a genuine dispute as to any material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). If the moving party makes this showing, the burden shifts to the nonmovant who "must set forth specific facts showing that there is a genuine issue for trial." *Jutrowski v. Twp. of Riverdale*, 904 F.3d 280, 288–89 (3d Cir. 2018) (quoting *D.E. v. Cent. Dauphin Sch. Dist.*, 765 F.3d 260, 268–69 (3d Cir. 2014)). Although courts view all facts in the light most favorable to the nonmoving party and draw all reasonable inferences in that party's favor, the nonmoving party cannot simply rely on the "mere allegations or denials of his pleadings." *Id.* at 288. Similarly, "[b]are assertions, conclusory allegations, or suspicions will not suffice." *Id.* at 288–89 (quoting *Central Dauphin*, 765 F.3d at 268–69). If the nonmoving party fails to make an adequate showing, the moving party is entitled to judgment as a matter of law. *Celotex*, 477 U.S. at 323.

## IV.    DISCUSSION

### A. Plaintiff's Appeal of Judge Waldor's Order

In reviewing Plaintiff's arguments as to why Judge Waldor erred, this Court is unconvinced that any of the arguments successfully articulate an error that is clearly erroneous or contrary to law. Frankly, Plaintiff's appeal takes issue with the *ways* in which Judge Waldor went about her decision but does not highlight where or how the law was misinterpreted or misapplied. In reviewing both the trajectory of discovery and the transcript from the April 3, 2025 hearing, this Court concludes that Judge Waldor did not abuse her discretion. Judge Waldor was at the helm of discovery from this case's inception making her thoroughly familiar with the parties and relevant discovery disputes. For example, regarding the AIF, she noted she had previously denied

Plaintiff's request three times and that Plaintiff had not provided concrete proof—but rather mere suppositions—as to whether Defendants updated the files. (D.E. 174 at 7–8.) Further, discovery did not end abruptly in this matter, as the parties had the opportunity to exchange information for almost four years with Judge Waldor extending deadlines—particularly for and at Plaintiff's behest—multiple times. Nothing in Judge Waldor's Letter Order constitutes an abuse of discretion or was clearly erroneous or contrary to law. Plaintiff's Appeal is denied.

### B. Defendants' Motions for Summary Judgment

Plaintiff's theory of the case is that he was wrongfully arrested and maliciously prosecuted, with Defendants conspiring to cover up their improper course of conduct. Further, Plaintiff claims Defendants' attempt to cover up the events in this case is emblematic of a broader pattern of utilizing excessive force, conducting false arrests, falsifying reports, and engaging in malicious prosecutions. Defendants respond to these claims by arguing the record demonstrates no genuine issue of material fact as to any of Plaintiff's claims.

Given that the bulk of claims asserted in this matter are federal, this Court addresses those claims and then turns to Plaintiff's state law claims. In addressing the federal claims, this Court first considers the applicability of the *Heck* bar and the doctrine of qualified immunity and then turns to the merits of the remaining claims.

### 1. Section 1983 Claims

Counts I through IV assert claims pursuant to Section 1983. *See Black v. Montgomery Cnty.*, 835 F.3d 358, 364 (3d Cir. 2016) ("[S]ection 1983 is not a source of substantive rights but rather a mechanism to vindicate rights afforded by the Constitution or a federal statute." (citing *Baker v. McCollan*, 443 U.S. 137, 144 n.3 (1979)). Section 1983 provides a cause of action for the deprivation of constitutional rights by persons acting under color of state law. *Torres v.*

*Madrid*, 592 U.S. 306, 310 (2021).  For a § 1983 cause of action, a plaintiff must demonstrate that (1) "the conduct complained of was committed by a person acting under color of state law" and (2) "the conduct deprived the plaintiff of rights, privileges or immunities secured by the Constitution or laws of the United States."  *Schneyder v. Smith*, 653 F.3d 313, 319 (3d Cir. 2011); *see* 42 U.S.C. § 1983.[16]

### a. Application of the *Heck* Doctrine to Plaintiff's False Arrest, False Imprisonment, Malicious Prosecution, and Conspiracy Claims

In Count II, Plaintiff alleges violations of his Fourth and Fourteenth Amendment rights. Count III asserts that Defendants conspired to engage in said violations.  Administrative Defendants argue that Plaintiff's failure to satisfy the *Heck* doctrine's favorable termination element is detrimental to his claims.  (D.E. 180-3 at 20–24.)  More specifically, Administrative Defendants point out that plea bargains do not constitute favorable terminations and thus, by pleading guilty to Guttenberg Municipal Ordinance § 3-1.1, Plaintiff did not receive a favorable outcome.  (D.E. 180-3 at 21–22.)  Administrative Defendants also argue that the plea bargain "conclusively establishes probable cause," thereby undermining Plaintiff's false arrest and malicious prosecution claims.  (D.E. 180-3 at 28.)  Lastly, Administrative Defendants urge this Court to reject the argument that a "civil reservation" makes *Heck* inapplicable, as that argument has been previously addressed and rejected in this District.  (D.E. 180-3 at 29–30.)

---

[16] Section 1983 provides in relevant part:

> [e]very person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress.

42 U.S.C. § 1983.

The *Heck* doctrine maintains that a plaintiff seeking to recover damages for an allegedly unconstitutional conviction or imprisonment, or for "other harm caused by actions whose unlawfulness would render a conviction or sentence invalid," must prove "that the conviction . . . has been reversed on direct appeal, expunged by executive order, declared invalid by a state tribunal authorized to make such determination, or called into question" through the issuance of a federal court's writ of habeas corpus. *Heck v. Humphrey*, 512 U.S. 477, 486 (1994). Where a district court's judgment in favor of the plaintiff would "necessarily imply the invalidity of his conviction or sentence," the court must dismiss the complaint unless the plaintiff can show "the conviction or sentence has already been invalidated." *Id.*; *see Jarvis v. Gliottone*, No. 14-7766, 2017 WL 5457986, at *5 (D.N.J. Nov. 14, 2017) ("[A] guilty plea is generally treated as a conviction, and *Heck* bars the § 1983 action if success would necessarily imply that the plaintiff's plea or conviction was invalid.").

Generally, "[c]laims for malicious prosecution or false imprisonment arising from the prosecution, arrest, and imprisonment" leading to a plaintiff's conviction are examples of *Heck*-barred claims, since success on those claims is contingent on showing unlawful prosecution or imprisonment. *Ortiz v. New Jersey State Police*, 747 Fed. App'x 73, 77 (3d Cir. Sept. 6, 2018). However, courts must conduct a fact-sensitive inquiry in comparing the relationship between the § 1983 claims asserted and the underlying conviction. *Id.*; *Gibson v. Superintendent of N.J. Dep't of L. & Pub. Safety, Div. of State Police*, 411 F.3d 427, 448–49 (3d Cir. 2005), *abrogated on other grounds, Wallace v. Kato*, 549 U.S. 384 (2007).

In *Fields v. City of Pittsburgh*, Fields, the plaintiff, got into an altercation with police which led to his arrest. 714 Fed. App'x 137, 139 (3d Cir. Oct. 26, 2017). Following his arrest, law enforcement charged Fields with aggravated assault, obstructing the administration of law, and

15

resisting arrest, but Fields ultimately pled guilty to "reduced charges of two counts of harassment and one count of disorderly conduct." *Id.* at 140. On appeal, the Third Circuit concluded the district court properly held that Fields's false arrest claim was barred by *Heck*. *Id.* at 140–41. The court reasoned that "[a]lthough Fields pleaded to lesser offenses than he was originally charged with, his guilty plea inherently included an acknowledgment that probable cause existed to arrest him for *some* offense." *Id.* at 140. This, coupled with the fact that Fields's success on the false arrest claim would "directly 'impugn[] the validity' of his resulting guilty plea," meant the claim fell squarely within *Heck*'s prohibition. *Id.* at 140–41 (alteration in original) (quoting *Gilles v. Davis*, 427 F.3d 197, 208–09 (3d Cir. 2005)).

Here, Plaintiff pled guilty to Guttenberg's Municipal Ordinance § 3-1.1, a noise ordinance, in exchange for all other charges being dismissed. (Guttenberg Ex. O at 5:17–6:3.) Plaintiff's factual allegations of false arrest, false imprisonment, fabrication of evidence, and malicious prosecution permeate Counts II and III and impermissibly call upon this Court to question the probable cause determination made in the underlying state court action, given that to succeed on his claims for Fourth and Fourteenth Amendment violations and conspiracy, Plaintiff would have to show the use of falsified evidence. *See Dowling v. City of Philadelphia*, 855 F.2d 136, 141 (3d Cir. 1988) ("The proper inquiry in a section 1983 claim based on false arrest or misuse of the criminal process is not whether the person arrested in fact committed the offense but whether the arresting officers had probable cause to believe the person arrested had committed the offense."); *cf. Wright v. City of Philadelphia*, 409 F.3d 595, 602 (3d Cir. 2005) ("[I]t is irrelevant to the probable cause analysis what crime a suspect is eventually charged with, or whether a person is later acquitted of the crime for which she or he was arrested." (citation omitted)).

Irrespective of the reasons why Plaintiff decided to assent to the plea deal, the record shows Plaintiff in fact took the plea deal, which precludes this Court from adjudicating claims which call into question the probable cause determination made by the Jersey City Municipal Court.  *See Walker v. Clearfield Cnty. Dist. Att'y*, 413 Fed. App'x 481, 484 (3d Cir. Jan. 24, 2011) ("[A] guilty plea—even one for a lesser offense—does not permit a later assertion of no probable cause."). That Plaintiff's plea was for a lesser offense and that the municipal court granted him a civil reservation are of no moment.  *See Ferry v. Barry*, No. 12-009, 2012 WL 4339454, at *5 (D.N.J. Sept. 19, 2012) (holding the plaintiff's plea to an amended charge under the defendant township's loitering ordinance precluded him from mounting a probable cause challenge and that alternatively, the plaintiff's claims were barred under the *Heck* doctrine); *Moran v. Hawthorne Police Dep't*, No. 24-9196, 2025 WL 842315, at *4 (D.N.J. Mar. 18, 2025) (concluding the plaintiff's § 1983 false arrest claim was barred by *Heck* and rejecting the plaintiff's argument that the presence of a civil reservation changed the analysis because "[w]hile a civil reservation may limit the plea's use in certain civil litigation context, it does not negate the fundamental principle that the guilty plea was and is valid and that the conviction conclusively established probable cause for the arrest"); *Altagracia v. Viola*, No. 21-13017, 2022 WL 1741711, at *5 (D.N.J. Dec. 5, 2022) (determining that the plaintiff's claim that the defendants conspired to file false disciplinary charges against him was barred by the *Heck* doctrine).  Plaintiff attempts to bring in the civil reservation while collaterally attacking his municipal court conviction.  The law does not permit Plaintiff to challenge the probable cause determination undergirding his plea while simultaneously benefitting from the civil reservation obtained through the plea.  Plaintiff's claims of false arrest, false imprisonment, malicious prosecution, and fabrication of evidence are thus barred by the *Heck* doctrine.  Counts II and III of Plaintiff's Amended Complaint are dismissed as to all Defendants.

### b. Qualified Immunity

Defendants argue that they are entitled to qualified immunity.  Defendants Magenheimer and Barrera argue they are entitled to qualified immunity because they did not violate a clearly established constitutional right.  (D.E. 180-3 at 50.)  As to Plaintiff's excessive force claim, Officer Defendants submit their use of force was objectively reasonable—as corroborated not only by their testimony but also that of Erika Mantilla's—and thus it follows they are entitled to qualified immunity.  (D.E. 179-3 at 24–31.)  Defendant Lugo also adds that there is no basis for supervisory liability because the force used was objectively reasonable.  (D.E. 179-3 at 32–33.)

The doctrine of qualified immunity shields government officials "from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Pearson v. Callahan*, 555 U.S. 223, 231 (2009) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)).  The doctrine applies unless a plaintiff establishes that (1) a government official "violated a statutory or constitutional right[] and (2) that the right was 'clearly established' at the time of the challenged conduct." *Ashcroft v. al-Kidd*, 563 U.S. 731, 735 (2011) (citing *Harlow*, 457 U.S. at 818).  Courts do not define whether a right was clearly established at a high level of generality, but rather with a high degree of specificity and in a context-specific manner, considering whether the right "is one that is so apparent that 'every reasonable official would understand that what he is doing is unlawful.'" *Dennis v. City of Phila.*, 19 F.4th 279, 288–89 (3d Cir. 2021) (quoting *James v. N.J. State Police*, 957 F.3d 165, 169 (3d Cir. 2020)).

Plaintiff asserts an excessive force claim in violation of his Fourth Amendment rights.  "To prevail on a Fourth Amendment excessive-force claim, a plaintiff must show that a seizure occurred and that it was unreasonable under the circumstances." *El v. City of Pittsburgh*, 975 F.3d

327, 336 (3d Cir. 2020) (quoting *Lamont v. New Jersey*, 637 F.3d 177, 182–83 (2011)).  Under prong one of the qualified immunity analysis, courts consider whether the arresting officers' use of force was objectively reasonable given the facts and circumstances confronting them, without regard for any underlying intent or motivation.  *Graham v. Connor*, 490 U.S. 386, 397 (1989). This requires assessing "the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether the suspect is actively resisting arrest or attempting to evade arrest by flight."  *Lankford v. City of Clifton Police Dep't*, 546 F. Supp. 3d 296, 309 (D.N.J. 2021) (citing *Graham*, 490 U.S. at 396–97).  Courts also consider whether:  there is physical injury to the plaintiff, the person subject to police action is violent or dangerous, an arrest is being effectuated, the suspect is armed, and the duration of the action.  *Id.* at 311–12.

This Court concludes Plaintiff has not demonstrated Defendants acted with excessive force and holds Defendants are entitled to qualified immunity.  In reviewing the facts concerning both incidents that took place on the morning of August 16, 2019, in the light most favorable to Plaintiff, Lugo, Ramadanovic, and Dominguez's use of force was objectively reasonable.  Moyett called the police after observing Plaintiff's behavior towards the Uber driver, noticing Plaintiff was potentially intoxicated, and being yelled at by him notwithstanding her attempts to calm him down. (Guttenberg Ex. C at 38:3–8, 16–17; 39:1–5; 40:1–9.)  More specifically, Moyett stated she felt it was necessary to call the police because "[Plaintiff] was walking around and he was following [the driver], so [she] felt that [Plaintiff] was threatening him."  (*Id.* at 40:15–19.)  When the officers arrived at the scene, Plaintiff was evasive and belligerent when questioned, and by his own admission he declined to furnish his identification when asked to produce it.  (Pl. SOMF ¶ 9.)

Given that the officers used only the force necessary to bring Plaintiff to the ground, Plaintiff's minimal injuries, and that Plaintiff posed a threat to the community, this Court

concludes the officers did not act in such a way that it would be apparent to a reasonable officer that his or her conduct was unlawful at the time, notwithstanding that Plaintiff was outnumbered and that the potential crime at issue was not severe. *See Rivera v. Como*, 733 Fed. App'x 587, 590–91 (3d Cir. 2018) (affirming the district court's finding that officers were entitled to qualified immunity where the plaintiff was loud, raucous, and upset about being escorted out of a bar and they used force to bring the plaintiff "under control and to place handcuffs on him" within a thirty-second span resulting in the plaintiff sustaining a sprained wrist, bruises, and abrasions). Officers Lugo, Ramadanovic, and Dominguez are entitled to qualified immunity on Plaintiff's excessive force claim.[17]

### 2.  § 1983 *Monell* and Supervisory Liability Claims

In a § 1983 action, although a municipality cannot be held liable under a *respondeat superior* theory, it may be held liable where "the action that is alleged to be unconstitutional implements or executes a policy statement, ordinance, regulation, or decision officially adopted and promulgated by that body's officers." *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 690 (1978). "Policy is made when a 'decisionmaker possess[ing] final authority to establish municipal policy with respect to the action' issues an official proclamation, policy, or edict." *Andrews v. City of Phila.*, 895 F.2d 1469, 1480 (3d Cir. 1990) (quoting *Pembaur v. City of Cincinnati*, 475 U.S. 469, 481 (1986)).  Custom "can be proven by showing that a given course of conduct, although not specifically endorsed or authorized by law, is so well-settled and permanent as

---

[17] Plaintiff does not identify either the rights violated, or the means used to violate said rights utilized by Defendants Rysiec, Martinez, Magenheimer, or Barrera in connection with the alleged Fourth Amendment violations.  Accordingly, those claims are dismissed. *See Ashcroft v. Iqbal*, 556 U.S. 662, 676 (2009) ("Because vicarious liability is inapplicable to *Bivens* and § 1983 suits, a plaintiff must plead that each Government-official defendant, through the official's own individual actions, has violated the Constitution."); *Jutrowski v. Twp. of Riverdale*, 904 F.3d 280, 290 (3d Cir. 2018) ("[I]f entities and supervisors may not be vicariously liable under § 1983 for the constitutional violation of a given individual, neither may that individual's cohorts who happen to be in the immediate vicinity.").

virtually to constitute law." *Bielevicz v. Dubinon*, 915 F.2d 845, 850 (3d Cir. 1990).  Not only must the plaintiff prove that the policy, practice, or custom violative of constitutional rights existed, but he or she must also demonstrate that such policy or custom was the proximate cause of the injuries suffered.  *Watson v. Abington Twp.*, 478 F.3d 144, 156 (3d Cir. 2007).

A *Monell* claim can also be premised on a municipality's failure to train, supervise, and discipline it officers.  *Estate of Roman v. City of Newark*, 914 F.3d 789, 798 (3d Cir. 2019); *see also Forrest v. Parry*, 930 F.3d 93, 105 (3d Cir. 2019) (explaining that liability premised on a municipality's failure or inadequacy "arose in the failure-to-train context, but applies to other failures and inadequacies by municipalities, including those related to supervision and discipline of its police officers").  Plaintiffs proceeding under a failure or inadequacy theory need not allege an unconstitutional policy but must "must demonstrate that a city's failure to train its employees 'reflects a deliberate or conscious choice.'"  *Est. of Roman*, 914 F.3d at 796.

A plaintiff sufficiently demonstrates deliberate indifference by showing that "(1) municipal policymakers know that employees will confront a particular situation[,] (2) the situation involves a difficult choice or a history of employees mishandling[,] and (3) the wrong choice by an employee will frequently cause deprivation of constitutional rights."  *Doe v. Luzerne Cnty.*, 660 F.3d 169, 180 (3d Cir. 2011) (quoting *Carter v. City of Philadelphia*, 181 F.3d 339, 357 (3d Cir. 1999)).  Generally, a plaintiff must show a pattern of "similar constitutional violations by untrained employees" to prove deliberate indifference.  *Connick v. Thompson*, 563 U.S. 51, 62 (2011).

In addition to deliberate indifference, to prevail on a failure to train theory "the identified deficiency in a city's training program must be closely related to the ultimate injury," requiring a plaintiff to "prove that the deficiency in training actually caused the police officers' indifference."  *City of Canton v. Harris*, 489 U.S. 378, 391 (1989).  This inquiry focuses on a training program's

adequacy as it relates to the tasks particular officers must perform and whether the injury would have been avoided "had the employee been trained under a program that was not deficient in the identified respect." *Id.* at 390–91.

Turning to Plaintiff's Amended Complaint, Plaintiff seeks to hold Administrative Defendants liable on *Monell* unconstitutional custom and negligent hiring and failure to train theories of liability. (AC at 13–15, 17–21.) Plaintiff claims Guttenberg had a custom of "falsely arresting, maliciously prosecuting and engaging in the use of illegal and excessive force on citizens," failing to maintain its recording system, and conducting sham Internal Affairs investigations. (AC ¶¶ 60, 94.) Plaintiff alleges Administrative Defendants not only "failed to properly determine the fitness" of the arresting Officer Defendants, but also failed to adequately train them to ensure they would not violate citizens' rights. (AC ¶¶ 79, 88.)

In his Opposition brief—which is difficult to follow as it often reads as a stream of consciousness, is riddled with *ad hominem* attacks, and is devoid of any case law—Plaintiff appears to rely on a January 17, 2019 Internal Affairs Report and an expert report to support his argument that genuine issues of material fact exist as to whether Guttenberg had an unconstitutional custom that was furthered and perpetuated by Administrative Defendants. (D.E. 187 at 12, 20–25.) Having reviewed both reports and the record at hand, this Court finds that there is no genuine issue of material fact pertinent to Plaintiff's *Monell*, negligent hiring, and negligent failure to train claims.

### a. The Guttenberg Police Department's January 17, 2019 IA Report[18]

---

[18] The January 17, 2019 Internal Affairs Report, authored by the Weiner Law Group, is not presently on the docket. In his Certification accompanying his Supplemental Statement of Material Facts, Plaintiff indicated these materials were confidential and would be sent to chambers. This Court received a copy of said Report—which Plaintiff labeled as Exhibit P—on May 14, 2025. The Report indicates on the title page that it is subject to the attorney-client privilege. In an abundance of caution, this Court refers to the Report's contents by the page numbers on the bottom center of each page.

The January 17, 2019 Internal Affairs Report ("the IA Report") details the GPD's methodology and conclusions concerning its investigation into allegations that Defendants Barrera, Lugo, and Magenheimer engaged in official misconduct and witness tampering and that the GPD's IA filing system was in disarray.[19]  (Pl. Ex. P at 10677.)  As to the witness tampering allegations, which related to events taking place in October 2016, the GPD concluded that "[t]here was no evidence of witness tampering" and thus, no basis to conclude that Administrative Defendants "tampered with witnesses (or improperly influenced/attempted to influence, the HCPO's investigations)."  (*Id.* at 10677, 10681.)

The GPD was unable to conclude precisely what occurred with the Department's IA files, however.  (*Id.* at 10677.)  The HCPO characterized the IA filing system as "a system in disarray, without any indexing or way to look for cases" and found that files were missing from Lugo and Magenheimer's files.  (*Id.* at 10677, 10679, 10682.)  The GPD similarly noted that while the IA files were "a mess" at least since 2012 and that Lugo "likely did not cause" the filing problems, his involvement with the unit "exacerbated" the issues.  (*Id.* at 10691.)  The GPD concluded that files "likely went 'missing' while Lt. Barrera was the Commander of Operations, Director Magenheimer was the Public Safety Director and Sgt. Lugo was the head of IA."  (*Id.* at 10677–78.)

Having detailed its methodology and findings, the IA Report set forth its recommendations and included the changes that were made to bring the GPD into compliance with the Attorney General's IA guidelines.  The IA Report recommended major discipline in the form of a thirty-day suspension for each of the Administrative Defendants after reviewing each officer or director's

---

[19] Initially, the two relevant IA complaints were referred to the Hudson County Prosecutor's Office ("HCPO") on or about January 23, 2017.  (Pl. Ex. P at 10677.)  The HCPO finalized its investigation on May 10, 2018 and concluded "that no criminal charges would be filed" and transferred the matters back to the GPD for further administrative review.  (*Id.*)

disciplinary record and the violated sections of the Policy Manual, respectively. (*Id.* at 10678, 10690–96.) As to the changes made, the IA Report noted that since the beginning of the HCPO's investigation, the GPD had "taken aggressive affirmative steps to rectify the administrative and managerial issues" plaguing the Department. (*Id.* at 10678.) These steps included hiring a consulting firm and implementing its recommendations, removing Lugo from the IA Officer position, relocating the IA unit to a locked office with cabinets fitted with metal bars and new locks, installing security cameras, and bringing the IA filing system into compliance with the HCPO's recommendations. (*Id.* at 10678, 10683, 10686–87.) The IA Report indicated that "[t]hese changes are having the desired remedial effects." (*Id.* at 10692 n.33.)

### b. Expert Report[20]

Plaintiff submitted expert Richard Rivera's ("Rivera") preliminary report in support of his case. Notwithstanding Administrative Defendants' lack of a challenge to this expert's report, this Court concludes Rivera's expert report is inadmissible and declines to consider it in its analysis. *See Countryside Oil Co., Inc. v. Travelers Ins. Co.*, 928 F. Supp. 474, 482 (D.N.J. 1995) ("It is well settled that only evidence which is admissible at trial may be considered in ruling on a motion for summary judgment." (citing Fed. R. Civ. P. 56(e); *Williams v. Borough of W. Chester, Pa.*, 891 F.2d 458, 471 (3d Cir. 1989) (Garth, concurring))); *Snead v. Casino*, 700 F. Supp. 3d 203, 215–17 (D.N.J. 2023) (*sua sponte* excluding an expert report after concluding the expert's conclusions were "largely inadmissible net opinions" and that the report failed to comply with the Federal Rules of Civil Procedure).

Rivera's report is excludable on two grounds. First, Rivera's expert report is inadmissible in response to this summary judgment motion because it is unsworn, in violation of Rule 56(c)(4)'s

---

[20] Plaintiff's expert report is similarly not on the docket. (*See* D.E. 199 at 2 (explaining that D.E. 189-8 lacks Exhibit Z).) This Court utilizes the expert report's internal pagination to refer to the contents therein.

requirement.  *See Snead*, 700 F. Supp. 3d at 215 ("Unsworn expert reports are inadmissible on a summary judgment motion."); *Fowle v. C &C Cola, a Div. of ITT-Continental Baking Co.*, 868 F.2d 59, 67 (3d Cir. 1989) (holding expert report that was attached to an affidavit of the plaintiff's counsel, as opposed to the expert's affidavit or deposition, "was not sworn to" as required by Rule 56(e) and was therefore "not competent to be considered on a motion for summary judgment"). Here, Plaintiff annexed Rivera's report to his own certification, rendering the report inadmissible as not competent evidence.  *See Snead*, 700 F. Supp. 3d at 215–16.

Second, Rivera's report runs afoul of the Federal Rules of Evidence by offering "ultimate issue" opinions.  Under the Federal Rules of Evidence, the undersigned is tasked with acting as "a 'gatekeeper' to ensure that any and all expert testimony or evidence is not only relevant, but also reliable."  *Kannankeril v. Terminix Int'l, Inc.*, 128 F.3d 802, 806 (3d Cir. 1997).  Federal Rule of Evidence 702, which governs expert opinion, has three requirements:  "(1) the proffered witness must be an expert, i.e., must be qualified; (2) the expert must testify about matters requiring scientific, technical or specialized knowledge; and (3) the expert's testimony must assist the trier of fact."[21]  *Pineda v. Ford Motor Co.*, 520 F.3d 237, 244 (3d Cir. 2008) (citing *Kannankeril*, 128

_____

[21] Federal Rule of Evidence 702 provides:

A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if the proponent demonstrates to the court that it is more likely than not that:

(a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;

(b) the testimony is based on sufficient facts or data;

(c) the testimony is the product of reliable principles and methods; and

(d) the expert's opinion reflects a reliable application of the principles and methods to the facts of the case.

F.3d at 806).  This set of requirements embodies a trilogy of restrictions on expert testimony—namely—qualification, reliability, and fit.  *Schneider ex rel. Est. of Schneider v. Fried*, 320 F.3d 396, 404 (3d Cir. 2003).  Under the "fit" requirement, admissibility "depends in part on 'the proffered connection between the scientific research or test result to be presented and the particular disputed factual issues in the case.'"  *In re Paoli R.R. Yard PCB Litig.*, 35 F.3d 717, 743 (3d Cir. 1994) (quoting *United States v. Downing*, 753 F.2d 1224, 1237 (3d Cir. 1985)).

Federal Rule of Evidence 704 also applies to expert testimony.  Although Rule 704 provides that "[a]n opinion is not objectionable just because it embraces an ultimate issue," Federal Rule of Evidence 704(a), experts are prohibited from "opining about [an] ultimate legal conclusion or about the law or legal standards," *Patrick v. Moorman*, 536 Fed. App'x 255, 258 (3d Cir. 2013).  Expert testimony may not opine "on 'what the law required' or 'testify as to the governing law.'"  *Holman Enter. v. Fidelity & Guar. Ins. Co.*, 563 F. Supp. 2d 467, 472 (D.N.J. 2008) (quoting *United States v. Leo*, 941 F.2d 181, 196–97 (3d Cir. 1991)).  An expert opinion containing "ultimate issue" opinions is excludable on a motion for summary judgment.  *See Holliday v. City of Elizabeth*, No. 13-1006, 2018 WL 953346, at *16 (D.N.J. Feb. 20, 2018) (excluding an expert report because it relied on improper factual findings as the basis for its conclusions and opined on the correct legal standard); *Patrick v. Moorman*, 536 Fed. App'x 255, 258 (3d Cir. 2013) (affirming district court's exclusion of an expert opinion on Rule 704 grounds); *Holman*, 563 F. Supp. 2d at 472 (excluding an expert report where the court found it was "replete with legal conclusions and speculations").

Rivera's report runs afoul of both Rules 702 and 704.  First, the report runs afoul of Rule 702's "fit" requirement, as it assesses vendor samples and whether those samples comport with the applicable laws, instead of assessing the GPD's actual policies.  For example, in the section

discussing IA Units, the report relies on the 2018 IA Policy Sample from the vendor the GPD uses as the basis for its conclusions. (Pl. Ex. Z at 34.) This does not comport with the "fit" requirement because the research contained in the report is not narrowly tailored to the specific policies at issue in the case, thereby making any conclusions reached minimally helpful to the fact finder, particularly when there is no other indication in the record linking the sample analyzed to the City's actual policy.

As to Rule 704, the report presents a number of issues. The report's major thesis is that "Defendants used improper force, were negligent, engaged in a pattern of retaliation and there exists a causal link between the use of force, unlawful actions, pre-textual arrest(s), lack of agency oversight and harm suffered by Mr. Alexander." (Pl. Ex. Z at 5.) That proposition is clearly a conclusion of law inappropriate for an expert report. In fact, throughout the report, Rivera impermissibly makes "ultimate issue" opinions on issues such as use of force, (*id.* at 25–26); custom (*id.* at 30); and whether policymakers within Guttenberg or the GPD should have been on notice as to the misconduct within the GPD, (*id.* at 35). Rivera even goes as far as to conduct his own analysis of the *Graham* factors in his excessive force analysis. (*Id.* at 28–29, 49.) Therefore, given that the report is riddled with impermissible "ultimate issue" opinions, this Court declines to consider the expert report in its analysis.

### c. Analysis

In reviewing the evidence in the record, this Court finds that the IA Report does not create a genuine issue of material fact as to whether Administrative Defendants had a custom violative of constitutional rights and were negligent in their hiring and training. The IA Report—published in 2019—but detailing the findings and conclusions of two investigations that concluded in 2017 and 2018 is not sufficiently temporally proximate to raise a genuine of material fact. As discussed

above, the IA Report details changes made within the GPD so as to bring it into compliance and update the IA record-keeping system.  By its very contents the IA Report demonstrates that Guttenberg took precautions against any potential future violations, thereby severing the temporal chain.  Unlike in *Estate of Roman v. City of Newark*, 914 F.3d 789, 798–99 (3d Cir. 2019), where the alleged conduct occurred during the time covered by the consent decree entered between the Department of Justice and the City of Newark, the misconduct alleged here is temporally separate from that analyzed in the IA Report.  It follows that this Court cannot infer that the misconduct alleged was taking place absent other evidence establishing a genuine issue of material fact.  Plaintiff does not point to any other credible evidence establishing such a genuine issue of material fact; thus, his *Monell* claim fails.

Second, Plaintiff's negligent failure to train claim similarly fails.  Plaintiff does not set forth how Guttenberg was deliberately indifferent—which generally requires demonstrating a pattern of similar constitutional violations—or what the specific deficiencies in training were.  It is insufficient to merely assert the GPD's training programs were deficient.  The Supreme Court has cautioned courts from holding municipalities liable when faced with allegations that "an injury or accident could have been avoided if an officer had had better or more training," recognizing that "[s]uch a claim could be made about almost any encounter resulting in injury." *City of Canton*, 489 U.S. at 391.

Plaintiff's negligent hiring claim suffers from the same deficiency with respect to deliberate indifference.  Namely, Plaintiff does not prove deliberate indifference. *See Bd. of Cnty. Comm'rs of Bryan Cnty. v. Brown*, 520 U.S. 397, 411 (1997) (explaining that for a § 1983 negligent hiring claim inadequate screening is not a basis for liability and instead, a plaintiff must prove the

hiring decision "deliberate indifference to the risk that a violation of a particular constitutional or statutory right will follow the decision").

Lastly, Plaintiff fails to prove a crucial element necessary for each of the aforementioned causes of action:  causation.  *See Watson*, 478 F.3d at 156 (*Monell* claim); *City of Canton*, 489 U.S. at 391 (failure to train); *Brown*, 520 U.S. at 410–11 (negligent hiring).  For none of these claims does Plaintiff set forth how the alleged custom, deficient training program, or failure to screen at hiring is linked to his injuries.  For these reasons, Counts I, IV, and V are dismissed.

### 3.  NJCRA Claim

Plaintiff's Amended Complaint also alleges violations of the NJCRA.  The NJCRA is the state law analogue to § 1983.[22]  *Perez v. Zagami, LLC*, 94 A.3d 869, 875 (N.J. 2014).  Given that the NJCRA "applies not only to federal rights but also to substantive rights guaranteed by" the state's Constitution and laws, *Gormley v. Wood-El*, 93 A.3d 344, 358 (N.J. 2014), this Court's § 1983 analysis will govern for claims brought under both § 1983 and the NJCRA.  *See Wang v. New Jersey State Police*, No. 18-11933, 2024 WL 3580671, at *16 (D.N.J. July 30, 2024) ("The NJCRA is interpreted nearly identically to § 1983 and claims under the NJCRA are generally coterminous with and subject to the same defenses and immunities as those brought under § 1983." (citing *Trafton v. City of Woodbury*, 799 F. Supp. 2d 417, 443–44 (D.N.J. 2011)).

---

[22] The NJCRA states:

> [a]ny person who has been deprived of any substantive due process or equal protection rights, privileges or immunities secured by the Constitution or laws of the United States, or any substantive rights, privileges or immunities secured by the Constitution or laws of this State, or whose exercise or enjoyment of those substantive rights, privileges or immunities has been interfered with or attempted to be interfered with, by threats, intimidation or coercion by a person acting under color of law, may bring a civil action for damages and for injunctive or other appropriate relief.

N.J. Stat. Ann § 10:6-2(c).

Given that "[c]ourts [in] this district have consistently interpreted § 1983 and the NJCRA analogously," such that they "must rise or fall together," and that Plaintiff's NJCRA claim mirrors his § 1983 claims, for the reasons stated *supra*, Count VII is dismissed. *Simmer v. Kehler*, No. 15-2285, 2015 WL 6737017, at *2 (D.N.J. Nov. 2, 2015).

### 4. IIED and NIED

Plaintiff's Amended Complaint asserts claims for intentional and negligent infliction of emotional distress (Count VI). Plaintiff's Opposition Brief offers no argumentation on these claims. Accordingly, this Court grants summary judgment on this count.

### 5. Punitive Damages

Municipalities are immune from punitive damages under § 1983. *City of Newport v. Fact Concerts, Inc.*, 453 U.S. 247, 271 (1981). Thus, Plaintiff may not pursue punitive damages against Guttenberg based on his § 1983 claims. Similarly, under New Jersey law, "[n]o punitive or exemplary damages shall be awarded against a public entity," N.J. Stat. Ann. § 59:9-2(c), such that Plaintiff cannot recover punitive damages on his state law claims against Guttenberg. Plaintiff's request for punitive damages against Guttenberg is therefore stricken. *See Awadalla v. City of Newark*, No. 16-2530, 2023 WL 6633851, at *4 (D.N.J. Oct. 12, 2023) (striking demand for punitive damages against the City of Newark in an action asserting § 1983 and related state law claims).

Although Plaintiff may pursue punitive damages against the individual Administrative and Officer Defendants, *Smith v. Wade*, 461 U.S. 30, 35 (1983), there is no basis for liability—let alone a finding of damages—in this matter. Thus, Plaintiff's request is denied and summary judgment is granted on this issue.

### V.    <u>CONCLUSION</u>

For the reasons stated above, Plaintiff's Appeal is **DENIED** and Defendants' Motions for Summary Judgment are **GRANTED**.  An appropriate order follows.


_____/s/ Susan D. Wigenton_____
**SUSAN D. WIGENTON, U.S.D.J.**


Orig:   Clerk
cc:     Parties
        Cari Fais, U.S.M.J.